*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDRE LAMAR CARTER,

        Defendant-Appellant.

UNPUBLISHED
November 19, 2020

No. 340645
Wayne Circuit Court
LC No. 16-010884-01-FC

Before: O'BRIEN, P.J., and BECKERING and CAMERON, JJ.

PER CURIAM.

As a result of a shootout with police in the early morning hours of December 1, 2016, defendant, Andre Lamar Carter, was convicted by a jury of three counts of assault with intent to commit murder, MCL 750.83, two counts of resisting arrest, MCL 750.81d(1), one count each of resisting arrest causing injury, MCL 750.81d(2), possession of less than 25 grams of cocaine, MCL 333.7403(2)(a)(v), felon in possession of a firearm, MCL 750.224f, and eight counts of possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to prison terms of 30 to 50 years for each assault with intent to commit murder conviction, 2-1/2 to 4 years for each resisting arrest conviction, 3 to 8 years for the resisting arrest causing injury conviction, 2-1/2 to 8 years for the possession of cocaine conviction, and 4-1/2 to 10 years for the felon-in-possession conviction, which were to be served concurrently, but consecutive to eight concurrent five-year terms of imprisonment for the felony-firearm convictions. Defendant appeals as of right his convictions. Finding no error requiring reversal, we affirm.

Early in the morning of December 1, 2016, Detroit Police Officers Vitally Borshch, Darius Shepherd, and Antonio Williams were on routine patrol in Detroit on Hull Street. They were in full uniform and riding in a fully marked police vehicle. As they were patrolling, Officer Borshch noticed a Mini Cooper parked in the street, away from the curb. The car's lights were on and the engine was running, but no one was inside. The officers stopped to investigate for a "simple civil infraction." The officers saw an unknown male on the sidewalk near the car, and another male on the porch of the house in front of which the car was parked. The officers testified that as soon as they got out of their vehicle to investigate, the man on the porch, defendant, began firing at them.

-1-

The unknown man ran away, but none of the officers saw where he went. Defendant ran from the porch to the driveway north of the house, and then toward the backyard, ignoring police commands to stop, while firing additional rounds at the officers during his flight. Officer Borshch received a graze gunshot wound.

The officers followed defendant and returned fire. Defendant climbed over a fence and headed down an alley. Police recovered a green and silver gun near the fence over which defendant had climbed. Defendant was eventually located lying in the backyard of a vacant house, suffering from multiple gunshot wounds. Michigan State Troopers helped render aid until emergency medical personnel responded. Defendant was transported to the hospital for treatment of his injuries. Officer Adnan Balija was with defendant at the hospital. The officer collected defendant's belongings, which included a sock that contained 21 .40-caliber rounds of ammunition. While going through defendant's clothing, "crack rocks" fell out of the jacket defendant was wearing. Officer Balija also recovered a "suspected crack pipe" from defendant's clothing. The parties stipulated that the substance found in defendant's clothing was cocaine. The defense also stipulated that defendant had previously been convicted of a specified felony and had not regained his right to lawfully possess a firearm.

The defense theory at trial was that Clay Stanley, who had spent the evening with defendant, was driving a Mini Cooper vehicle owned by defendant's aunt to a gas station, but parked it in the street and got out just before the police arrived. Stanley was purportedly the man that the officers had observed standing on the sidewalk near the Mini Cooper. The defense contended that it was Stanley who fired the first two shots, which set off the chain of events. When Stanley ran off, defendant followed him into the backyard and the police ran after both of them. A neighbor testified that she heard someone say, "I surrender, I surrender," before additional shots were fired. Although defendant admitted possessing a firearm during the incident, he denied firing it and he claimed he tossed his gun on the ground after realizing that the men chasing him were police officers; police never recovered this gun. Defendant denied using or possessing the gun the police found by the fence, and the police did not find any spent shell casings in the areas from which the officers claimed defendant shot at them. The defense maintained that defendant never fired any shots at the officers and did nothing wrong, and that the case involved a cover up by the police to avoid responsibility for shooting defendant for no reason.

After the jury convicted defendant as charged, defendant filed a motion for a new trial on grounds of ineffective assistance of counsel and prosecutorial misconduct. He also argued that the jury's verdicts were against the great weight of the evidence. Following an evidentiary hearing, the trial court denied defendant's motion on all grounds.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first contends that the trial court erred in denying his motion for a new trial based on constitutionally ineffective assistance of counsel. Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review the trial court's factual findings for clear error, and we review de novo whether the facts as found by the trial court establish a violation of the defendant's constitutional right to the effective assistance of counsel. *Id*.

"To establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and that counsel's representation prejudiced him so as to deprive him of a fair trial." *People v Carrick*, 220 Mich App 17, 22; 558 NW2d 242 (1996). To establish prejudice, defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v Johnson,* 451 Mich 115, 124; 545 NW2d 637 (1996). Defendant has the burden of producing factual support for his claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999), and he must overcome the presumption that the challenged action might be considered sound trial strategy, *People v Tommolino,* 187 Mich App 14, 17; 466 NW2d 315 (1991). A sound trial strategy is one based on investigation and supported by reasonable professional judgments. *People v Grant,* 470 Mich 477, 486-487; 684 NW2d 686 (2004). Failure of counsel to conduct a reasonable investigation can constitute ineffective assistance of counsel. *People v McGhee,* 268 Mich App 600, 626; 709 NW2d 595 (2005).

Defendant asserts that trial counsel rendered ineffective assistance by failing to listen to audio recordings of four telephone calls defendant made while he was in jail. At trial, when the prosecutor announced her intent to introduce the jailhouse telephone calls, defense counsel asked the court to adjourn for the rest of the day to allow him additional time to review the recordings. He explained that he had listened to three of the calls and was aware of the substance of defendant's statements in the fourth call, but had not listened to the fourth call. The court denied defense counsel's request. Two of the calls were played for the jury after the lunch break, and the other two were played the next day. Defendant contends that because his attorney had not listened to the recordings prior to trial, he was unprepared to explain that certain incriminating comments were made while defendant was under the influence of pain medication.

The record does not support the claim that defense counsel was unprepared to address or respond to the recordings. Although counsel admitted having not reviewed one of the four telephone recordings before trial, he was aware of the substance of defendant's statements in that call. Further, there was a break in the trial before all of the calls were played, which allowed counsel time to review the calls and raise any objections to their admission. Defendant complains that defense counsel did not provide him with the actual recordings before trial. However, counsel testified at the post-trial evidentiary hearing that jail personnel prevented him from taking the recordings into the jail, even though he had an order from the court to do so. In addition, defendant admitted at the hearing that, prior to trial, defense counsel gave him a sheet of paper with specific incriminating statements from the recordings highlighted, and that he and counsel had discussed the statements. Given this record, defendant has not shown that counsel performed below an objective standard of reasonableness, see *Carrick*, 220 Mich App at 22, or failed to make defendant aware of the incriminating comments in the audio recordings in time for defendant to assist in preparing his defense.

Defendant faults counsel for not attempting to mitigate the impact of the calls by introducing evidence that defendant was "heavily medicated and not in his right state of mind" when he made them because he was recovering from his gunshot injuries. The record does not support this claim. At trial, the prosecutor elicited from defendant that he was hospitalized for approximately nine days before he was released to jail, and that he began making the recorded calls five to seven days after he arrived at the jail. There was no evidence that any medication defendant continued to receive at the jail affected his mental acuity or awareness at the time he

made the calls. Further, even if defendant had been under the effects of pain medication when he made the calls, the record indicates that counsel may have had strategic reasons for not introducing such evidence. Defendant testified at the evidentiary hearing that he thought some portions of the recorded calls supported his account of the events, so defense counsel agreed to admit the calls. Contending that defendant was "not in his right state of mind" when he made the calls would have affected the exculpatory statements as well as the inculpatory statements; defendant has presented no legal or rational basis for arguing that he was lucid when making exculpatory statements, but muddled by pain medication when making inculpatory statements. Thus, to the extent the calls were deemed useful to support defendant's version of the events, counsel had a strategic reason for not introducing evidence that might have called into question the reliability of this evidence. Accordingly, defendant has not shown that trial counsel's handling of the telephone recordings supports a claim of ineffective assistance of counsel.

Defendant next argues that defense counsel was ineffective for not objecting to the admission of a dash-cam video recording from the scout car of two officers who arrived after the shooting. Defendant contends that the video was: (1) irrelevant, since it depicted the scene after the shooting and not the shooting itself; (2) the "vehicle in question" at the scene had already been moved, and (3) hearsay radio transmissions were recorded as part of the video. Because defendant has failed to overcome the presumption that counsel's decision not to oppose admission of the dash-cam video was strategic or to show that he was prejudiced by the video's admission, we disagree.

At the evidentiary hearing, defense counsel explained that he saw no reason to exclude the dash-cam video because it supported defendant's claim that he did not know it was the police who had pulled up next to the Mini Cooper because they had pulled up without their lights activated. To the extent the evidence supported defendant's position, not opposing its admission seems reasonable, *Cline*, 276 Mich App at 637, and we will not substitute our judgment for that of counsel regarding trial strategy, *Davis*, 250 Mich App at 368. In addition, although defendant asserts that the dash-cam video contained "hearsay chatter [that] was damaging," he does not identify the substance of any particular radio transmission or explain how it was prejudicial. Defendant having failed to overcome the presumption that admission of the dash-cam video might be considered sound trial strategy, *Tommolino,* 187 Mich App at 17, or to establish that, but for admission of the evidence, there is a reasonable probability that the outcome of the trial would have been different, *Johnson,* 451 Mich at 124, counsel's failure to object to admission of the dash-cam video does not sustain a claim of ineffective assistance of counsel.

Defendant further argues that defense counsel was ineffective for failing to obtain video footage from the Motor City Casino and dash-cam video footage from the vehicle Borshch was driving. Again, the record does not support these claims. Regarding his unsuccessful efforts to obtain video from the Motor City Casino, counsel testified at the evidentiary hearing that he believed he submitted a subpoena, and then:

> I contacted the casino first on my own.· Then I have a·friend of mine who was at one point he was with the D[rug] E[nforcement] A[gency] and he had connections with the casino security and he put me in touch with the person.· I can't remember the lady's name who was in charge at [Motor City Casino] and she told me they couldn't find anything on record.

The record indicates that defense counsel made reasonable attempts to obtain the casino video, including calling in personal favors, but no video was available. There is no evidence that counsel's efforts were unsuccessful because he unreasonably delayed in trying to obtain the video. Accordingly, the record does not support a finding that counsel's performance fell below an objective standard of reasonableness, and defendant's claim of ineffective assistance based on counsel's failure to obtain the casino video necessarily fails. See *Carrick*, 220 Mich App at 22.

As to counsel's alleged failure to obtain dash-cam video from the police vehicle Borshch was driving, defendant has not provided any evidence showing that such video actually existed. Having failed to meet his burden to produce factual support for his claim of ineffective assistance, defendant's claim on this ground also fails. See *Hoag*, 460 Mich at 6.

For the reasons stated above, we conclude that defendant has failed to establish any of his various claims of ineffective assistance of counsel. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for a new trial based on defendant's assertion that constitutionally ineffective assistance of counsel deprived him of his right to fair trial.

## II. GREAT WEIGHT OF THE EVIDENCE

Defendant next argues that the trial court erred in denying his motion for a new trial because his conviction for assault with intent to commit murder is against the great weight of the evidence. We disagree. This Court reviews "for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of reasonable and principled outcomes. *Id*.

Determining whether a verdict is against the great weight of the evidence requires review of the whole body of proofs. *People v Herbert*, 444 Mich 466, 475; 511 NW2d 654 (1993), overruled in part on other grounds in *People v Lemmon*, 456 Mich 625; 576 NW2d 129 (1998). A reviewing court may not substitute its view of the credibility of witnesses for that of the jury, absent exceptional circumstances. See *id*. at 642. Exceptions include when the testimony contradicts indisputable physical facts or laws, is patently incredible, defies physical realities, is so implausible that it could not be believed by a reasonable juror, or was so far impeached that it was deprived of all probative value. *Id*. at 643-644. Nevertheless, when the question is one of "credibility posed by diametrically opposed versions of the events in question," the test of credibility must be left with the trier of fact. *Id*. at 646-647. "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Lacalamita*, 286 Mich App at 469. "The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008) (quotation marks and citation omitted).

In his motion for a new trial, defendant argued that the jury's verdict was against the great weight of the evidence because the physical evidence did not support the officers' testimony that he was the shooter. Specifically, he argued that there was no fingerprint or gunshot-residue evidence to support a finding that he was the shooter, that his DNA was not found on the weapon

that was recovered, and that the shell-casing evidence did not support the officers' account. Defendant argued that, because the indisputable physical evidence contradicted the officers' testimony, the officers' testimony was so "inherently implausible" that no reasonable juror could have believed it. We are unpersuaded.

"The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. The intent to kill may be proved by inference from any facts in evidence." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541, 548 (2011). At trial, three police officers identified defendant as the person who fired several gunshots at them and ignored their commands to stop. Deputy Robert Charlton, a firearms examiner with the Oakland County Sheriff's Department, examined the firearms and firearm evidence collected from the scene. He testified that four firearms were recovered: three issued by the Detroit Police Department and the fourth, a Springfield Armory firearm with a green grip and silver slide. One of the officers involved testified that the gun defendant was using had a silver slide. The officers' testimony that defendant pointed the Springfield Armory gun at them and shot at them, if believed, was sufficient to establish the elements of assault with the intent to murder. See *People v Davis*, 216 Mich App 47, 53; 549 NW2d 1 (1996) (concluding that the victim's testimony that the "defendant pointed a pistol at him, warned him not to come any closer or he would kill him, and pulled the trigger several times (but no bullets fired)" was sufficient to establish the elements of assault with intent to murder).

Defendant relies primarily on the *absence* of physical evidence to support his argument that the officers' testimony could not be believed. He contends that, although he was not wearing gloves, his fingerprints and DNA were not found on the Springfield Armory firearm, and no gunshot residue test was performed to suggest that he was the shooter. However, defendant has presented no evidence indicating that a gunshot residue test *should* have been performed, and it is pure speculation that the results of such test would support his claim that he did not fire a gun. It is true that neither defendant's fingerprints nor DNA were found on the Springfield Armory weapon, but forensic scientist Erica Anderson testified that there was not enough DNA from the handgun to attribute its use to anyone; thus, she could neither include nor exclude defendant as the user.

Regarding the shell-casing evidence, defendant contends that the number of shell casings recovered does not support the officer's testimony regarding how many rounds were allegedly fired at them or that defendant fired the shots. However, police evidence technician Officer Raymond Diaz testified that it was not generally unusual to be unable to find all of the fired bullets or shell casings at a scene for various reasons. Diaz testified that the Hull Street scene was poorly lit, especially in the backyard, and the evidence technicians did not have the use of a metal detector. Asked if he could "say with absolute certainty that you could find every piece of evidence in that yard with all the dead leaves on the ground[,]" Officer Diaz responded that he could not. His testimony is confirmed by the fact that the number of shell casings recovered from the weapons

issued by the Detroit Police Department was less than half the number of rounds fired.[1] Defendant also testified that there were a lot of leaves and debris around, and that when he got up off the ground after having been shot, leaves were stuck all down the front of his body. Given the poor lighting, the lack of a metal detector, the blanket of leaves covering areas of the search, and the obvious fact that far more shots were fired from the police weapons than were recovered by the evidence technicians, the jury might reasonably have given less weight to the shell-casing evidence than to the officer's testimony.

Defendant also contends that the fact that the shell casings attributed to the Springfield Armory gun were not found in defendant's front or back yard signifies that he did not fire them and renders unbelievable the officers' testimony that he did. However, the jury heard the officers testify that the shooting involved a fluid situation in which defendant fired shots as he was running from his porch to the driveway and then to his backyard before climbing a fence. The prosecution also presented the testimony of a neighbor, Desha Hokes, who testified that after hearing three gunshots coming from the side of her house next to defendant's house, she heard someone repeatedly say, "Detroit police" and "Detroit, police, get down," She then heard two shots coming from the front of her house, followed by additional gunshots that sounded similar to the first set of shots, but coming from the back of the house, which is where the officers testified defendant ran and fired at them as he was running. Hokes then heard gunshots that sounded similar to the second round, as if someone was firing back at the person firing the first set of gunshots. Although the police did not find shell casings in defendant's backyard, Hokes's testimony supported the police officers' testimony that gunshots were fired at them as defendant ran toward his backyard. In addition, Officer Diaz's testimony about the conditions and challenges of the search for evidence provided a plausible explanation for the results of the recovery effort. Finally, as the trial court pointed out, "[f]ired shell casings do not necessarily remain static and could be moved by any number of means and do not always remain where they originally land after being ejected from a firearm."

In sum, the jury's conviction of defendant for assault with intent to murder is not contrary to the weight of the evidence actually presented by the prosecution. The absence of additional evidence, or the lack of perfect correspondence between the physical evidence and the officers' testimony, does not render their testimony so implausible that it could not be believed by a reasonable juror. *Lemmon*, 456 Mich at 643. We conclude that the trial court did not abuse its discretion by finding that other evidence in this case, or the lack of additional evidence, did not render the officers' testimony unbelievable and that the evidence did not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. See *id*. at 627 (noting that a judge "may grant a new trial only if the evidence preponderates heavily against the verdict so that it would be a miscarriage of justice to allow the verdict to stand").

---

[1] Sergeant Michael Jackson testified that, after receiving the weapons of the three officers involved in the incident, he determined that they had fired a combined total of 38 rounds. Yet, Officer Charlton testified to the recovery of only 18 shell casings attributable to the officers' weapons.

### III. PROSECUTORIAL MISCONDUCT

Next, defendant argues that he is entitled to a new trial because the prosecutor knowingly presented false testimony from Officer Adnan Balija, who testified that he recovered a suspected "crack pipe" from defendant's clothing at the hospital, and from Officers Borshch, Shepherd, and Williams, who testified that defendant fired shots at them when there was no physical evidence to support that testimony. Defendant further asserts that the prosecutor improperly resorted to "name calling" during closing argument by repeatedly labeling him a liar.

Defendant preserved the issue of the prosecutor's presenting false testimony at trial by raising it in his motion for a new trial. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007) (indicating that an issue is preserved for appellate review if it is "raised, addressed, and decided by the lower court). However, because defendant never objected to the prosecutor's remarks during closing argument, that issue is unpreserved. See *id*. We review preserved claims of prosecutorial misconduct by reviewing the record de novo to determine if defendant was denied a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004). Review of an unpreserved claim of prosecutorial misconduct "is limited to whether plain error affecting substantial rights occurred." *People v Abraham,* 256 Mich App 265, 274; 662 NW2d 836 (2003). To qualify as plain error, the error must be "clear or obvious." *People v Jones*, 468 Mich 345, 355-356; 662 NW2d 376 (2003); *People v Carines*, 460 Mich 750,763; 597 NW2d 130 (1999). A clear or obvious error is "one that is not 'subject to reasonable dispute.' " *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted). An error affects substantial rights if it is prejudicial, i.e., if it affects the outcome of the proceedings. *Carines*, 460 Mich at 763.

Claims of prosecutorial misconduct are decided case by case and the challenged conduct must be viewed in context. *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996). The test for prosecutorial misconduct is whether the defendant was denied a fair trial. *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995). Perjury consists of a sworn witness willfully making a false statement regarding any matter or thing. MCL 750.423(1); see also *People v Lively*, 470 Mich 248, 253-254, 680 NW2d 878 (2004). A defendant's right to due process is violated when the prosecution allows false testimony from one of its witnesses to go uncorrected. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). The defendant has the burden of demonstrating that the evidence or testimony was in fact false. See *People v Bass*, 317 Mich App 241, 272; 893 NW2d 140 (2016).

Defendant has not shown that Officer Balija testified falsely about finding a "crack pipe" in defendant's clothing. Defendant bases his claim of perjury solely on the fact that discovery of a crack pipe in defendant's clothing was not reported or shared before trial. Assuming for the sake of argument that the existence of the crack pipe had not been reported or shared before trial, that fact, alone, does not establish that Officer Balija's testimony was false. Thus, defendant has failed to meet his burden to demonstrate that the officer's testimony was false. *Id*. Regarding the claim that officers testified falsely that he fired gunshots at them, defendant is essentially asking this Court to re-assess the officers' credibility. As already discussed, none of the exceptions that would justify our rejecting the jury's assessment of the witness' credibility is present here. See *Lemmon*, 456 Mich at 642. The jury's verdict indicates that it found the officers' testimony credible, and defendant has given us no reason to reject this assessment. See *id*.

Regarding defendant's allegations of prejudicial name-calling, prosecutors are afforded great latitude during closing argument. Prosecutors may not make a statement of fact that is unsupported by the evidence, but they are permitted to argue the evidence and reasonable inferences arising from the evidence in support of the theories of their cases. *Bahoda,* 448 Mich at 282; *People v Ackerman,* 257 Mich App 434, 450; 669 NW2d 818 (2003). Moreover, prosecutors are not required to phrase their arguments in the blandest of terms, but may use "hard language" when the evidence supports it. *Bahoda,* 448 Mich at 282; *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). In particular, prosecutors are permitted to argue from the evidence that a witness, including the defendant, is not worthy of belief. *People v Howard*, 226 Mich App 528, 548; 575 NW2d 16 (1997).

At trial, defendant presented a version of events starkly at odds with the testimony of several police officers. Accordingly, the prosecutor was permitted to argue that the evidence showed that defendant was lying and that his version of events did not make sense. The record demonstrates that the prosecutor called defendant's credibility into question by drawing sharp contrasts between defendant's trial testimony and statements he made during his jailhouse telephone conversations. Under these circumstances, the prosecutor's remarks referring to defendant as a "liar" did not constitute plain error. See *Bahoda,* 448 Mich at 282; *Howard*, 226 Mich App at 548.

## IV.  RIGHT TO PRESENT A DEFENSE

Defendant next contends that certain of the trial court's evidentiary rulings violated his constitutional right to present a defense. They did not. Defendant objected to the trial court's rulings, thus preserving the evidentiary issue for appellate review. See *Metamora Water Svc,* Inc, 276 Mich App at 382. We review constitutional claims de novo, and a trial court's decision on the admissibility of evidence for an abuse of discretion. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). "An abuse of discretion occurs when trial court's decision is outside the range of principled outcomes." *Id.*

"A criminal defendant has a state and federal constitutional right to present a defense." *People v Kurr*, 253 Mich App 317, 326: 65 NW2d 651 (2002). However, this right is not absolute; it must " 'bow to accommodate other legitimate interests in the criminal trial process.' " *Ungar*, 278 Mich App at 250, quoting *United States v Scheffer*, 523 US 303, 308; 118 S Ct 1261; 140 L Ed 2d 413 (1998) (citations omitted). "States have been traditionally afforded the power under the constitution to establish and implement their own criminal trial rules and procedures. *Unger*, 278 Mich App at 250. Michigan has "broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (quotation marks and citations omitted).

Defendant contends that the court's ruling that he could not cross-examine Deputy Charlton regarding gunshot-residue testing violated his constitutional right to present a defense. This claim of error is without merit. Deputy Charlton was qualified as an expert in toolmark and firearms examination. Asked by defense counsel whether he worked with gunshot residue, Deputy Charlton stated that he did not. When defense counsel pressed on, asking Charlton to explain gunshot residue to the jury, the prosecutor objected on grounds that Charlton was not an expert,

and no gunshot residue test was in evidence. Defense counsel responded: "He's an expert in the field of ballistics and firearms. I think he can testify to what gunshot residue is, he is an expert, and we haven't gotten to that point in this trial yet but there will be some inquiry as to whether gunshot residue was obtained in this case." The court sustained the prosecutor's objection.

Charlton asserted that he was not an expert in gunshot residue, and defense counsel essentially conceded that gunshot residue was not in evidence. Thus, Charlton could not testify as an expert under MRE 702, and even if he could have, any such testimony was prohibited by MRE 703, which requires expert witnesses to base their opinions on facts in evidence. Accordingly, the trial court was not preventing defendant from presenting a defense, it was rightly applying Michigan's rules of evidence to prevent the introduction of potentially unreliable and irrelevant testimony. Under these circumstances, we cannot say that the trial court abused its discretion by ruling that counsel could not cross-examine Deputy Charlton on gunshot residue or that the ruling denied defendant's right to present a defense. See *Unger*, 278 Mich App at 250 (noting that MRE 703 "does not infringe on a criminal defendant's right to present a full defense").

Defendant alternatively argues that defense counsel was ineffective for not securing an expert to testify regarding gunshot-residue testing, or for not attempting to have Deputy Charlton qualified as an expert on gunshot-residue testing. Again, we disagree. Defendant has not preserved this issue for appellate review; therefore, our review is for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764. As previously indicated, a defendant asserting a claim of ineffective assistance must prove that counsel's performance was below an objective standard of reasonableness and that, but for counsel's performance, there is a reasonable probability that the outcome would have been different. *Carrick*, 220 Mich App at 22; *Johnson*, 451 Mich at 124.

Given Charlton's testimony that he did not work with gunshot residue, any attempt to qualify him as an expert would have been futile. Counsel is not ineffective for failing to take a meritless position. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Since no gunshot residue test was performed, and defendant has failed to submit an affidavit or offer of proof from another qualified expert stating that such test was required under the circumstances, we cannot say that counsel performed below an objective standard of reasonableness by failing to obtain a gunshot residue expert for trial. Having failed to establish that his trial counsel's performance with regard to the issue of gunshot residue was deficient, defendant's claim of ineffective assistance necessarily fails. See *Carrick*, 220 Mich App at 22.

Defendant also argues that the trial court denied his right to present a defense when it ruled that he could not admit for impeachment purposes a previously recorded interview that prosecution witness Desha Hokes gave to the police. The trial court barred admission of the recording as hearsay, but instructed counsel that he could ask Hokes "was she asked a certain question and did she give a certain answer and you can state what that was on the record and ask if she did or did not make it . . . ." The trial transcript shows that this is precisely what counsel did. Further, he confirmed at the post-trial evidentiary hearing that he was able to introduce the impeachment material he wanted through cross-examination, concluding: "I thought that was good testimony." Given defendant's impeachment of Hokes with the prior statements contained on the recording, he has no basis for asserting that the trial court violated his right to present a defense by ruling that the recording itself was inadmissible.

## V. EVIDENCE OF A PRIOR ALTERCATION BETWEEN DEFENDANT AND A WITNESS

Lastly, defendant argues that the trial court erred by allowing the prosecutor to question a witness, Deonte Love, about a 2016 altercation with defendant. Defendant objected to this testimony on the ground of relevance. Accordingly, defendant's appellate challenge to the relevancy of the testimony is preserved and will be reviewed for an abuse of discretion, with any preliminary issues of law being reviewed de novo. *People v Washington,* 468 Mich 667, 670-671; 664 NW2d 203 (2003). However, defendant did not object below on the ground that the testimony should be excluded under MRE 403 or because it was not admissible under MRE 404(b)(1). "An objection based on one ground is usually considered insufficient to preserve an appellate attack based on a different ground." *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004). Accordingly, defendant's appellate challenges based on MRE 403 and MRE 404(b)(1) are unpreserved, and will be reviewed for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

At trial, Love, who lived next door to defendant, testified about events that he witnessed on the night of the shooting. Although he had lived next door to defendant for perhaps a year, and he admitted knowing defendant, he denied that he saw defendant in the courtroom. After that denial, the prosecutor questioned Love about his involvement in an altercation with defendant earlier in 2016, when defendant allegedly threatened him with a gun. Love admitted that this was a memorable event and then explained that it was because of that event that he did not want to identify defendant in court. Asked why not, Love said, "It's the tomorrow incident." In response, the prosecutor said, "You still live there, don't you." Love answered, "Correct, m'am."

Contrary to what defendant argues, Love's testimony was relevant to Love's credibility. "Credibility of a witness is almost always at issue, and thus evidence bearing on that credibility is always relevant." *People v Spaulding*, __ Mich App __, __; __ NW2d __ (2020) (Docket No. 348500); slip op at 11. Defendant further argues that, even if relevant, the trial court should have excluded the evidence under MRE 403 because its probative value was substantially outweighed by the danger of unfair prejudice. Love's testimony regarding the 2016 encounter was highly probative of Love's credibility. It explained his refusal to identify defendant as the man next to whom he had lived for some time, and provided the jury with information to consider when determining whether to believe any, all, or some of Love's testimony. And although Love's testimony about the confrontation was prejudicial, it is not clear that any prejudice from the testimony substantially outweighed the testimony's probative value. "All relevant and material evidence is prejudicial; [courts] are concerned only with unfairly prejudicial evidence that may be given inappropriate weight by the jury or involve extraneous considerations." *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018). Here, defendant had already stipulated to prior felony convictions that currently prohibited him from possession a firearm, yet, he testified to possessing a weapon on the night of the incident, and that he intended to use it to shoot whoever came up the

driveway.[2]  In addition, the jury heard defendant make a statement on one of the jailhouse telephone recordings that indicated that he had fired toward the officers.[3]  In light of the prejudicial testimony introduced into the record by defendant, we cannot say that any prejudice from Love's brief testimony about his prior altercation with defendant substantially outweighed its probative value for assessing Love's credibility.  Accordingly, defendant has not demonstrated that the introduction of this evidence was plain error.

Defendant also argues that the testimony was inadmissible under MRE 404(b)(1) and that the prosecutor violated MRE 404(b)(2) by not providing pretrial notice of her intent to offer the evidence at trial.  MRE 404(b)(1) prohibits evidence of a defendant's "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," but permits such evidence for other noncharacter purposes.  *People v Crawford*, 458 Mich 376, 384; 582 NW2d 785 (1998).  Evidence of other crimes, wrongs, or acts is admissible under MRE 404(b)(1) if it is (1) offered for a proper purpose, i.e., not to prove the defendant's character or propensity to commit the crime, (2) relevant to an issue or fact of consequence at trial, and (3) sufficiently probative to outweigh the danger of unfair prejudice under MRE 403.  *People v VanderVliet*, 444 Mich 52, 74-75; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).  To the extent that the challenged testimony implicated MRE 404(b)(1), the testimony was not inadmissible under that rule because it was not introduced for the purpose of showing defendant's character or propensity to engage in gun violence.  Rather, it was offered for the noncharacter purpose of explaining Love's refusal to identify defendant, his neighbor, at trial.  As previously indicated, the testimony was relevant for that purpose and defendant has not shown that MRE 403 required exclusion of the testimony.

MRE 404(b)(2) requires the prosecution to provide notice of its intent to introduce evidence under MRE 404(b)(1) at least 14 days in advance of trial, but permits the trial court to excuse pretrial notice on good cause shown.  Although the prosecutor did not provide pretrial notice of the challenged testimony, the testimony became relevant only because Love denied recognizing defendant at trial, and there is no indication that the prosecutor had any reason to anticipate that Love, who had been defendant's next-door neighbor for a year, would deny being able to identify defendant.  Had defendant objected, these circumstances support the conclusion that good cause existed for excusing pretrial notice of this evidence.  Accordingly, defendant has also failed to establish any plain error under MRE 404(b)(2).

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Thomas C. Cameron

---

[2] Defendant testified that, after the shooting began, he was standing in the backyard at one point, with his driver's license in one hand and his gun in the other, "I'm standing there waiting on them to come up the driveway.  I mean, truthfully, I'm waiting -- I'm going to shoot them."

[3] Defendant was heard to say that his bullets went into the car.